IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ADEMOLA ILORI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 08-1219 |
| | ) | |
| CARNEGIE MELLON UNIVERSITY | ) | |
| and LEONARD BRUSH, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

CONTI, District Judge

Ademola Ilori ("plaintiff"), an African-American software engineer, commenced this race-based discrimination action against his former employer, Carnegie Mellon University ("CMU") and former supervisor Leonard Brush ("Brush," together with CMU, collectively "defendants"). Plaintiff's complaint includes the following claims: (1) race-based hostile work environment implicating a constructive discharge in violation of the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. §§ 959 *et seq.* ("PHRA"); (2) retaliation implicating a failure to promote and constructive discharge in violation of the PHRA, 43 Pa. Cons. Stat. § 595; (3) race-based discrimination implicating a failure to promote in violation of the PHRA; and (4) race-based hostile work environment, retaliation, and race-based discrimination implicating a failure to promote and constructive discharge, pursuant to 42 U.S.C. § 1981 ("§ 1981").[1]

---

[1] There is a pervasive fog over federal jurisprudence concerning the terms used for particular employment discrimination claims. Plaintiff asserted claims for failure to promote and constructive discharge. After reviewing plaintiff's claims, the court is not able to discern distinct failure to promote or constructive discharge "claims," because the PHRA and § 1981 do not provide relief for such claims standing alone;

rather, a failure to promote and a constructive discharge are ways in which a plaintiff can prove an "adverse employment action" or a "tangible employment action" – elements necessary to demonstrate employment discrimination claims such as hostile work environment, retaliation, or race-based discrimination. See Colwell v. Rite Aid Corp., 602 F.3d 495, 503 n.7 (3d Cir. 2010) (recognizing the plaintiff relied on constructive discharge "as the single adverse employment action upon which her ADEA claim [was] based"); Barzanty v. Verizon PA, Inc., 361 F. App'x 411, 414 (3d Cir. 2010) (recognizing the plaintiff's race discrimination claim was based on her employer's failure to promote); O'Connor v. City of Newark, 440 F.3d 125, 127 (3d Cir. 2006) (recognizing an employer's failure to promote qualified as a discrete act that would bar the plaintiff's retaliation claim under the statute of limitations); Embrico v. U.S. Steel Corp., 245 F. App'x 184, 187 (3d Cir. 2007) (analyzing the appellants' disparate treatment claims under the PHRA and other statutes, the issue before the court was "whether Appellants suffered an adverse employment action, which include[d] constructive discharge"); Durham Life Ins. Co. v. Evans, 166 F.3d 139, 155 n.11 (3d Cir. 1999) ("We do not establish a blanket rule that any constructive discharge is a tangible employment action. We merely hold that, in this instance, the tangible adverse actions that [the plaintiff] suffered would foreseeably have led a reasonable person to resign."); James v. Booz-Allen & Hamilton, Inc., 368 F.3d 371, 376, 378 (4th Cir. 2004) (considering a race discrimination claim in violation of Title VII, the court recognized the plaintiff alleged "a litany of adverse changes" to his employment, including a constructive discharge "claim").

The Supreme Court of the United States in Pennsylvania State Police v. Suders, 542 U.S. 129 (2004), aptly explained the nature of a hostile work environment claim implicating a constructive discharge:

> The constructive discharge here at issue stems from, and can be regarded as an aggravated case of, sexual harassment or hostile work environment. For an atmosphere of sexual harassment or hostility to be actionable, we reiterate, the offending behavior 'must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.' A hostile-environment constructive discharge claim entails something more: A plaintiff who advances such a compound claim must show working conditions so intolerable that a reasonable person would have felt compelled to resign.

Suders, 542 U.S. at 146-47.

The Third Circuit's Model Civil Jury Instructions ("Instructions") are instructive on this issue. The Instructions list employment discrimination claims and their elements under Title VII and § 1981. See, e.g., ♦-6 Modern Federal Jury Instructions – Civil, ¶¶ 6.1.1-7 (Matthew Bender) (2010). Tellingly, the Instructions do not outline any claim for constructive discharge; rather, the Instructions identify constructive discharge under "definitions." Id. ¶ 6.2.3. The Instructions state:

> [C]onstructive discharge is the adverse employment action that is most common with claims of hostile work environment. Instruction 6.2.3 provides an instruction setting forth the relevant factors for a finding of constructive discharge. That instruction can be used to amplify the term 'adverse employment action' in appropriate cases.

Id. ¶ 6.1.3.

The court considers plaintiff's PHRA and § 1981 "claims" for failure to promote as race-based discrimination claims implicating a failure to promote. Similarly, the court considers plaintiff's § 1981 "claim" for constructive discharge as a hostile work environment claim and a retaliation claim implicating a constructive discharge. If there is a hostile work environment and no tangible adverse employment action, an employer will not be liable if it proves it "exercised reasonable care to prevent and correct promptly any [discriminatory] harassing behavior" and that the plaintiff "unreasonably failed to take advantage of any

2

After considering the defendants' motion for summary judgment (Docket No. 21), plaintiff's response (Docket No. 31), the joint statement of material facts ("J.C.S.") (Docket No. 44), and the parties' other submissions, defendants' motion will be denied with respect to plaintiff's § 1981 and PHRA claims for retaliation. Defendants' motion will be granted with respect to all remaining claims because the claims are either time-barred or plaintiff did not adduce sufficient evidence for a jury to render a verdict in his favor.

*Factual Background*

**A. General**

Ilori began his employment at CMU in 2000 as an intern in the Department of Administrative Computing and Information Services ("ACIS"). (J.C.S. ¶ 1.) ACIS was responsible for, among other things, administrative software development and deployment and maintaining information systems managed by ACIS. (Id. ¶ 2.) After completing his internship, Brush offered plaintiff a full-time position with ACIS. Brush offered plaintiff a software engineer I position. (Id.) Plaintiff accepted the position and commenced his employment with CMU in December 2000. (Id.) Plaintiff's experience working in computer programming and software development before his full-time employment was training at the Institute for Advanced Technology and his internship with ACIS. (Id. ¶ 4.) In 2004, ACIS employed twenty-five employees. (Id. ¶ 5.)

---

preventative or corrective opportunities provided by the employer or to avoid harm otherwise." Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765 (1998); see Swinton v. Potomac Corp., 270 F.3d 794, 803 n.3 (9th Cir. 2001) (Ellerth defense applies in a § 1981 case). In a case like this one where a tangible employment action – a constructive discharge – is alleged, the employer will not have available that affirmative defense. See Crawford v. Metro. Gov't of Nashville & Davidson Cnty., Tenn., 129 S. Ct. 846, 852 (2009) ("there is no affirmative defense if the hostile work environment 'culminates in a tangible employment action' against the employee") (citing Ellerth, 524 U.S. at 765).

**B. Plaintiff's work assignments and supervisors**

From 2000 through the end of 2003, plaintiff reported to Robert Rittiger ("Rittiger") and Mary Ann Blair ("Blair"). (Defs.' App. (Docket No. 24), Tab E at 41-42.) Plaintiff considered Blair "a good mentor, a friend and the rest," and his "best supervisor." (Defs.' App., Tab B at 224-25.) Plaintiff considered Ashish Khetan ("Krishna"), a senior co-worker, to be his mentor. (Id. at 61.) Plaintiff avers he had no single supervisor and was isolated in the department. (Ilori Aff. (Docket No. 30), ¶¶ 13-14.)

CMU invited plaintiff to work on a software development project undertaken by ACIS called the "Applicant Tracking Project" ("TMS"). (Pl.'s App. (Docket No. 40), Tab 18 at 43.) TMS used the computer programming language known as Java. (Id.) In early 2003, plaintiff withdrew from TMS and recommended his co-worker as a replacement. (Id. at 45-46.) Plaintiff contended he withdrew from the project to allow Janet Piper ("Piper"), who he recruited to CMU, to work on the project. (Id.)

In August 2003, plaintiff was assigned to the risk management information system ("RMIS") project. (J.C.S. ¶ 13.) The RMIS project was a long-term development assignment for plaintiff in the Oracle platform. (Pl.'s App., Tab 18 at 20.) Krishna previously trained plaintiff on Oracle format reports. (Id. at 37.) Plaintiff was excited when Blair invited him to work on the RMIS project. (Id. at 36.) As part of the project, plaintiff designed and developed the vehicles module. (J.C.S. ¶ 20.) The vehicles module involved developing a portion of the risk management information system that would track every vehicle owned by CMU, the insurance carried on the vehicle, the age of the vehicle, etc. (Id.; Defs.' App., Tab F at 53.)

In December 2003, Blair went on a maternity leave of absence. (J.C.S. ¶ 16.) In anticipation of her leave, Blair assigned Carol Rigdon ("Rigdon") as the project leader on the RMIS project and as plaintiff's immediate supervisor. (Id.) Plaintiff asserts Rigdon, as a senior software engineer, did not have supervisory authority over him as a software engineer I. (Pl.'s App., Tab 8 at 8.6-8.7.) Rigdon came to CMU in 1999 from Oracle Corporation where she did Oracle software development. (J.C.S. ¶ 17.) She was hired by ACIS for her knowledge and background with the Oracle architecture to which CMU was in process of converting. (Id.) Prior to supervising plaintiff, Rigdon was assigned to work for more than a year on a project in the School of Computer Science concerning issues with the Oracle system. (J.C.S. ¶ 18.) During the project, Rigdon placed one of the employees, who was white, on probation, and subsequently terminated his employment for failing to improve his performance to a satisfactory level. (Id.; Defs.' App., Tab G at D-0178-81, D-0197.)

In the spring of 2004, the RMIS project was still in the design phase. (J.C.S. ¶ 22.) The design phase was a crucial part of software development – similar to creating a blueprint for a building. (Id.) In March 2004, Rigdon provided plaintiff with a technical specifications template for performing the assigned tasks on RMIS using the Oracle platform. (Defs.' App., Tab F at 60-61, Tab C at 82.) According to Rigdon and Blair, the templates were given to plaintiff because his development assignment "appeared to be a difficult thing for him to grasp." (Defs.' App., Tab C at 82.) Plaintiff asserts the specifications template was incomplete. (Pl.'s App., Tab 18 at 36.)

On April 2, 2004, Brush became aware that plaintiff disparaged Rigdon to co-workers in ACIS and discussed personnel issues with employees who were not his

supervisors.  (Defs.' App., Tab A at 74-75.)  Brush could not recall plaintiff's statements, but remembered plaintiff complained to co-workers John Zamperini, Piper, and John Bird.  (Id.; Pl.'s App., Tab 1 at 1.37-1.38.)

## C.  Evaluations

The performance management process in ACIS was a continuous process of objective setting, development, and review with the goal of continuing to enhance performance and develop the employee. (Defs.' App., Tab C at 57.) The performance management process was interactive; encouraging open lines of communication and sharing the objectives. (Id.)[2]  The supervisor turned handwritten comments into a final performance evaluation document that was co-signed by the supervisor and employee. (Id.) Sometimes supervisors, however, did not make final documents and have them signed. (Id.)  The performance review guidelines were a human resource tool available to departments at CMU, but there was no requirement employees receive reviews on an annual basis.  (J.C.S. ¶ 7.)

In March 2001, plaintiff received written performance objectives including "Oracle Report Development." (Defs.' App., Tab B at D-0889.) The performance objectives included a section labeled "Oracle Reports" with the handwritten comment "meet with Krishna, 1 hour per week . . . Krishna mentors." (Id. at D-0890.) Plaintiff did not sign this evaluation. (Id.) In April 2002, plaintiff received written performance objectives including "[b]ecome proficient in the use of Oracle Report Writer." (Id. at D-0891.) Plaintiff signed this evaluation.  Although the document is dated April 10, 2002, his signature is dated April 4, 2002.  (Id. at D-0891-93.)  In February 2003, plaintiff's

_____

[2] Plaintiff contends defendants' performance management process was flawed because, among other things, plaintiff never signed several performance objectives, his supervisor was not qualified to oversee his work, and he was isolated in the department.

performance objectives included "[b]ecome proficient in the use of Oracle Report Writer." (Id. at D-0897.) Plaintiff did not sign this performance review. (Id.) Plaintiff signed a draft of performance objectives for the period March 2004 through June 2004, which included: "Become proficient developing Oracle Forms & Reports within Oracle applications' architecture" and "[b]ecome a team player." (Defs.' App., Tab B at D-0221.)

### D. Alleged qualifications for promotion

A software engineer I was required to "maintain existing applications . . . [and] make system directions." (Pl.'s App., Tab 8 at 8.6-8.9.) These responsibilities were necessary to keep the applications and systems that currently existed up and running, and correct and enhance them as needed. (J.C.S. ¶ 79.) Other duties included running the production of existing applications, working with supervisors and clients to make production schedules, and detecting and correcting production errors. (Id. ¶ 80.) The senior software engineer "devise[d] solutions to business problems . . . [and] develop[ed] and test[ed] applications." (Id. ¶ 83; Pl.'s App., Tab 15 at 50.) Blair explained the senior software engineer was required to communicate well with business customers and engage in new development efforts; rather than starting from pre-existing programs and enhancing the software. (Pl.'s App., Tab 15 at 50.)

Plaintiff asserts he was involved in complex software development work during his employment at CMU. (J.C.S. ¶ 81.) Plaintiff states because he was not under any supervision, he was performing the job of a senior software engineer. (Id. ¶ 62.) Blair described plaintiff's projects as enhancement projects, requiring no experience with software development from scratch, and with no responsibility for the development of

business relationships. (Pl.'s App., Tab 15 at 43-50.) During the spring of 2004 it was the consensus of Blair, Rittiger, and Martha Baron ("Baron") that plaintiff lacked skills for promotion to senior software engineer. (Defs.' App., Tab C at D-0923.) To receive the promotion, plaintiff needed to "build the necessary skills in programming, database design, SQL, operating in a Unix environment and teamwork." (Id.) Blair, Rittiger, and Baron agreed the RMIS assignment provided plaintiff the opportunity to acquire the necessary skills "for a successful promotion bid." (Id.)

On April 2, 2004, Brush and Blair met with plaintiff to discuss his approaching Blair for a recommendation for promotion. (J.C.S. ¶ 75.) During the meeting, Brush confronted plaintiff about his discussing personnel issues (including his poor relationship with Rigdon) with co-workers. Brush stated, "If I hear you say anything about Carol, I will fire you." (Defs.' App., Tab B at 11.) Plaintiff asked why he could not be evaluated on the work he had done with Java for a promotion. (J.C.S. ¶ 76.) Brush stated, "If I hear you say 'Java' one more time, I will fire you." (Id. ¶ 77.)

**E. Alleged retaliation incidents**

On April 5, 2004, plaintiff approached Brush around noon to discuss Brush's threats to fire him. (J.C.S. ¶ 87.) Plaintiff told Brush he was going to speak with CMU president Jared Cohon ("Cohon") about Brush's conduct, which he asserts was in violation of CMU's diversity policy, and about the alleged racism plaintiff was experiencing. (Id.) Brush advised plaintiff to speak with ombudsman Everett Tademy ("Tademy") about his issues instead of Cohon. (Id. ¶ 88.) Plaintiff subsequently delivered a letter to Cohon's office explaining Brush's threat to fire him in the presence of another

supervisor. (Pl.'s App., Tab 1 Ex. 1.8.)[3] Plaintiff explained in the letter he "had [no] peace" since the threat because he perceived the threat to be serious. (Id.)

After Brush's meeting with plaintiff on April 5, 2004, Brush sent an email to Tademy stating: "I will be initiating an involuntary termination in the department (ACIS) today; any advice?" (Pl.'s App., Tab 2 Ex. 2.4.) Tademy recalled talking to Brush on April 5, 2004. (J.C.S. ¶ 91; Defs.' App., Tab Q at 48.) Brush "was upset" and wanted to fire plaintiff. (Id.) Tademy could not recall why Brush wanted to fire plaintiff. (Id.) On April 7, 2004, Brush met with William Elliot and CMU counsel to discuss his decision to terminate plaintiff for cause. (Pl.'s App., Tab 2 Ex. 2.1.) Blair subsequently contacted Ed Hey ("Hey") and "was told to move forward with either the probation letter or involuntary termination." (Id.)

On April 5, 2004, plaintiff met with Blair and Rigdon to review the performance objectives discussed in March 2004. (J.C.S. ¶ 26.) Blair and Rigdon revised those performance objectives and directed plaintiff to "become a RMIS team player." (Defs.' App., Tab A at D-2532.) The evaluation objectives included:

> Successfully contributes to group performance by completing tasks on time and as assigned; [a]ctively participates in team discussions; [a]ccepts technical direction and mentoring from senior team members; [c]onforms to group standards for software development . . . [and r]esolves issues within the team structure (Escalation path: Carol Rigdon, then Mary Ann Blair, and ultimately Len Brush.)

(Id.)

---

[3] The parties dispute the date plaintiff delivered the letter to Cohon, and the date anyone had knowledge of the letter. Viewing the disputed facts in a light most favorable to plaintiff, the court must consider plaintiff to have delivered the letter on April 5, 2004.

On April 12, 2004, plaintiff received an email from Rigdon asking why he did not attend a regularly scheduled meeting on that day. (J.C.S. ¶ 100; Defs.' App., Tab B Ex. 8.) Plaintiff responded with an email saying he "just forgot about it." (Defs. App., Tab B Ex. 8.) Plaintiff checked his electronic calendar that morning and the meeting was not scheduled.  (J.C.S. ¶ 101.)  When he checked his electronic calendar later in the day, however, the meeting was on his schedule. (Id. ¶ 102.) On May 16, 2004, plaintiff notified the computer science department about a possible glitch in the corporate time calendar that may have caused the disappearance of the appointment. (Id.; Pl.'s App., Tab 1 Ex. 1.79.) Plaintiff was informed a calendar glitch was possible. (Id.) A meeting was subsequently scheduled for April 19, 2004. (J.C.S. ¶ 28; Defs.' App., Tab A at 75-76.) Plaintiff asserts he went to Rigdon's office on April 19, 2004 at 9:30 a.m. (the time the meeting was scheduled) and Rigdon was not there. (Defs.' App., Tab A at 93.) Defendants assert Rigdon had not arrived at work. (Id.) Plaintiff made no effort to inform Rigdon he went to her office on time for the meeting, and Rigdon made no effort to ask plaintiff why he was not at the meeting. (Id.)

On or about April 23, 2004, Blair gave plaintiff a memorandum dated April 21, 2004, entitled "Departmental Discussions – Second Warning." (J.C.S. ¶ 104.) The memorandum concerned plaintiff's continuing conduct to discuss "personnel matters" with employees who were not his supervisors.  (Defs.' App., Tab B Ex. 10.) The memorandum encouraged plaintiff to discuss his issues with Rigdon or Blair because they were his supervisors.  (Id.)  In the memorandum Blair explained:

> If you have work-related and/or personnel concerns moving forward, I remind you to follow the escalation path identified in your Performance Management Form dated April 5, 2004.  Carol Rigdon is your immediate supervisor.

> If you can not resolve your concern with Carol, feel free to
> come to me.

(Id.) Blair informed plaintiff in the memorandum to contact Hey at human resources if plaintiff felt it was necessary. (Id.) Plaintiff asserts he never received a first warning "letter" prior to the "Second Warning" memorandum. Defendants counter the first paragraph of Blair's April 23, 2004 memorandum expressly referred to the prior *verbal* warning Brush gave to plaintiff on April 2, 2004. (Id.) (emphasis added).

On April 26, 2004, Blair gave plaintiff a memorandum dated April 23, 2004, entitled "Probationary Action." (Defs.' App., Tab B at D-0111.) In the memorandum, Blair reminded plaintiff that during their meeting to review his performance objectives on April 5, 2004, they discussed plaintiff becoming a team player on the RMIS project. (Id.) The memorandum described the ways in which plaintiff violated specific evaluation criteria for that objective including: plaintiff's failure to attend meetings with Rigdon on April 12, 2004 and April 19, 2004; plaintiff's resistance to the documentation framework (template) given by Rigdon for the development project; plaintiff's failure to resolve issues within the team structure; and plaintiff's general lack of responsiveness and cooperation with Rigdon. (Id.) The memorandum informed plaintiff to observe regular office hours and notify Rigdon if he would not be in the office between 8:30 a.m. and 5:00 p.m. (Id.) The memorandum placed plaintiff on probation from April 23, 2004 to June 30, 2004. (Id.) If plaintiff's performance did not improve in the outlined areas, plaintiff might have faced further disciplinary action, including termination. (Id.) The probationary action caused plaintiff to be ineligible for a merit increase in pay in June 2004. (Id.) On the same day defendants issued the probation memorandum, Brush sent an email to Blair, Rittiger, and Baron, stating, "THANX FOR EXTRA EFFORT; I think

the timing of the probation letter will make his grievance a bit weak.  We shall see, Len."
(Pl.'s App., Tab 1 Ex. 1.22.)

In late April or early May 2004, plaintiff saw a stress counselor due to work-related stress three or four times. (Pl.'s App., Tab 18 at 215.) Plaintiff saw the counselor because the probation letter suggested he do so, and the letter provided plaintiff with the number to CMU's employee assistance program. (Id.) CMU paid for three sessions under this program. (Id.) Plaintiff paid for one or two additional sessions on his own. (Id.) On April 26, 2004, plaintiff filed a complaint with Tademy accusing ACIS of discriminating against him. (Pl.'s App., Tab 1 Ex. 1.26.)  In his complaint, plaintiff asserted Blair's memorandum entitled "Department Discussions – Second Warning" and the probation were acts of retaliation for "trying to improve diversity in ACIS."  (Id.)

In May and June 2004, ACIS provided plaintiff with two separate training sessions to develop technical skills in the Oracle platform. The first training session took place the week of May 10, 2004.  ACIS provided plaintiff with in-house, in-person technical development training on PL/SQL. (Defs.' App., Tab F at 44.) PL/SQL is coding language for Oracle. (Id. at 45.) Plaintiff asserts this training session was not suitable for him because it was too advanced.  (Defs.' App., Tab B at 127.) The training was not comparable to similar software training given to non-ACIS staff members that lasted three to four weeks. (Defs.' App., Tab C at 34-37.)  The second session went from June 8 to 17, 2004, and ACIS paid an outside vendor to provide technical development training to plaintiff on "Extend the Oracle Applications (Forms Development)." (Defs.' App., Tab B at 126-27, D-0116.) Plaintiff asserts this training was not adequate to prepare him for his work assignments. (J.C.S. ¶ 38.)

On May 28, 2004, Blair and Rigdon met with plaintiff to conduct a review of his progress on developing the design for the vehicles module for RMIS. (J.C.S. ¶ 34.) On June 1, 2004, Blair sent plaintiff an email discussing the May 28, 2004 meeting, telling plaintiff:

> You were disrespectful of your supervisor – this is not acceptable . . . you did not focus on the purpose of the meeting . . . you were argumentative even before the substantive discussion began . . . your behavior was extremely unprofessional and is affecting your ability to get the job done as well as costing others valuable time and productivity . . . you must be cooperative if we can proceed with mentoring and training . . . the way you were behaving and ignoring your supervisor was insubordinate. As long as you behave in this manner you will not be a productive member of the team. Worse, continued insubordination will result in disciplinary action. Meetings with your supervisor are designed to be constructive and informative. In the future, please attend prepared to listen, learn, share, and engage with due respect and professionalism.

(Defs.' App., Tab B Ex. 15.)

On or about July 8, 2004, Rigdon gave plaintiff a written review of his performance during the probation period. (Defs.' App., Tab B at D-0116.) Plaintiff received a "Below Expectations" rating from Rigdon with respect to the objectives of (1) becoming proficient in developing Oracle forms and reports within Oracle application architecture, and (2) becoming a RMIS team player. (Id.) Despite Rigdon's evaluation of "Below Expectations," Rittiger and Baron provided comments on the review and rated plaintiff's overall performance as "At Expectations." (Id.) Blair prepared a memorandum expressing the same concerns about plaintiff mentioned in the April 23, 2004 probation letter. (Id.)

### F. The risk management position in Qatar

In the spring of 2004, plaintiff was interested in pursuing an employment position at CMU's new campus in Doha, Qatar. (J.C.S. ¶ 41.) In March 2004, plaintiff applied for the position of risk management specialist at the Qatar campus. (Pl.'s App., Tab 18 at 51-53; Defs.' App., Tab H at D-0492, D-0422.) Plaintiff's wife secured employment in Qatar to begin July 2004. (Defs.' App., Tab I at D-0541-42.) While plaintiff's application for employment in Qatar was pending, he sought a personal leave of absence from ACIS to bridge his service with CMU until he obtained a job in Qatar. (J.C.S. ¶ 44.) CMU provided personal leaves of absence only to staff members whose performance was satisfactory and if the department was reasonably certain the staff member intended to return at the end of the leave. (Defs.' App., Tab J at D-2269.) Approval of a requested leave was at the discretion of the department head. (Id.)

On July 8, 2004, Blair, Sally Love, and Brush met with plaintiff to discuss his leave request. (Pl.'s App., Tab 1 Ex. 1.76.) During the meeting, plaintiff stated July 16, 2004 would be his "last day." (Id.) Brush attempted to confirm that July 16, 2004 would be plaintiff's last day of employment at CMU. (Id.) Plaintiff became confused stating he was not ending his employment, but seeking a leave. (Id.) Plaintiff stated, "I am not leaving, I'm not quitting. I am still an ACIS employee." (Pl.'s App., Tab 18 at 144.) Brush replied that if plaintiff did not resign, he would pick a date for him to resign. (Id.) Brush advised plaintiff his days at ACIS were numbered. (J.C.S. ¶ 119.) Plaintiff reiterated at the conclusion of the meeting: "As of today, I am not leaving." (Pl.'s App., Tab 1 Ex. 1.76.) Brush denied plaintiff's leave of absence request during the July 8, 2004 meeting. (Id.)

Because his leave of absence was denied, plaintiff sought paid-time-off ("PTO") to relocate his wife and children to Qatar. (Pl.'s App., Tab 18 at 129-30.) Plaintiff was on PTO from on or about July 23, 2004 through August 23, 2004. (Id.) Defendants assert plaintiff did not inform Brush if or when he planned to return to ACIS. (Defs.' App., Tab A at D-2993.) Plaintiff responds he "told [defendants] when [he] was coming back" to ACIS. (Pl.'s App., Tab 18 at 144.)

On August 23, 2004, plaintiff returned to work at ACIS in Pittsburgh. (J.C.S. ¶ 122.) Blair had transferred positions and was no longer working in ACIS on that day. (Defs.' App., Tab B Ex. 18.) Brush assigned Rittiger to assume Blair's role in plaintiff's supervisory chain of command. (Pl.'s App., Tab 18 at 152-53; Defs.' App., Tab B Ex. 18.) Plaintiff avers that on July 23, 2004 (i.e., the day plaintiff began PTO) his name was removed from the CMU server and he could not access the applications he was working on in Qatar. (Pl.'s App., Tab 18 at 144.) On August 23, 2004, plaintiff found his office had been reassigned, the area reconfigured, and his computer was gone. (Id. at 155.) On August 23, 2004, Rigdon sent an email to plaintiff giving him certain assignments while he waited for his computer to be reconnected and his work area to be reconfigured to its original layout. (Defs.' Supplemental App. (Docket No. 43), Tab 4.) Rigdon stated in the email she expected plaintiff's work area would be restored "tomorrow afternoon . . . ." (Id.) Plaintiff's access to the database at ACIS was denied until August 30, 2004. (Pl.'s App., Tab 18 at 144.)

The risk management specialist position in Qatar for which plaintiff had applied was withdrawn on August 27, 2004. (Defs.' App., Tab H at D-0488; Pl.'s App., Tab 9 at 9.18, 9.27.) From the time the position was originally posted to the time it was

withdrawn, there was an ongoing discussion among the Qatar management team to define what CMU wanted in the position. (Pl.'s App., Tab 14 at 14.5-14.8.) The posted position description, however, remained substantively the same until it was withdrawn. (Pl.'s App., Tab 9 at 9.2-9.29.)  Experience in environmental health and safety and risk were the primary qualifications for the job listing. (Id.) On August 26, 2004, Chuck Thorpe ("Thorpe"), dean of the Qatar campus, and Mohamed Dobashi, associate dean of the Qatar campus, suggested the job responsibilities of the risk management position could be fulfilled by drawing on the expertise of various existing employees at the Pittsburgh campus. (Defs.' App., Tab H at D-3001.)  In October 2004, James Gartner was appointed senior director of global security. (Defs.' App., Tab H at 6-7.) The position was based in Pittsburgh with the primary responsibility for security at CMU's Qatar campus. (Id.) Gartner was transferred to Qatar in August 2006. (Id. at 22-23.)

On September 1, 2004, Rittiger and Rigdon met with plaintiff to resume the discussion of his work performance detailed in the performance review document given to plaintiff in July 2004. (J.C.S. ¶ 50.) Rittiger and Rigdon gave plaintiff a memorandum outlining his assignments and their expectations on the RMIS project.  (Defs.' App., Tab B Ex. 19.) The memorandum informed plaintiff his probationary period would continue from August 29, 2004 through September 30, 2004 for the purpose of providing plaintiff "an opportunity to improve [his] work performance and show that [he would be] able to conduct [himself] in a professional manner." (Id.)  Defendants assert Rigdon went on vacation immediately following the assignment, and plaintiff asserts he could not receive guidance from anyone to do the work.  (Pl.'s App., Tab 18 at 178.)  Rigdon took a "long Labor Day holiday" to attend a wedding. (Defs.' App., Tab F at 95.) On September 2,

2004, plaintiff was denied an early lunch to accommodate a doctor's appointment the following day. (Pl.'s App., Tab 18 at 177.)

On September 2, 2004, plaintiff visited a doctor to address the stress and alleged hostility he faced at work. (J.C.S. ¶ 51.) Plaintiff's last day at work was September 3, 2004. (Ilori Dep. at 182.)[4] On September 3, 2004, after working until about 10:30 a.m., plaintiff delivered a doctor's note to CMU which stated he would be excused from work for the remainder of September 3, 2004 until November 3, 2004. (J.C.S. ¶ 52; Ilori Dep. at 182.) CMU approved plaintiff for short-term disability leave through early December 2004. (Id.) Plaintiff never returned to work after September 3, 2004. (Id.) While on disability leave plaintiff was an employee of CMU and received income, health insurance and other benefits. (J.C.S. ¶ 53.) During his disability leave, plaintiff sent two resignation letters – the first dated October 18, 2004, and the second dated October 20, 2004 – stating his resignation would be effective December 4, 2004. (J.C.S. ¶ 54.)

### Procedural History

On May 18, 2004, plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). (Defs.' App., Tab R at D-0079-81.) The EEOC charge was dual-filed with the Pennsylvania Human Relations Commission ("PHRC"). (Id.) On June 3, 2008, plaintiff received notice his EEOC and PHRC complaints were dismissed. (Id. at D-0548.) Plaintiff filed his complaint in this case on September 3, 2008. (Pl.'s Compl. (Docket No. 1).)

---

[4] The record is not clear regarding plaintiff's last day at work. In plaintiff's deposition, he states his last day at work was "September 2," 2004. (Ilori Dep. at 179.) When pressed on the matter, however, plaintiff stated he "came to work" on September 3, 2004, and "worked until about 10:30." (Ilori Dep. at 180.) Viewing the evidence in the light most favorable to plaintiff and drawing all inferences in his favor, the court must consider plaintiff's last day at work to be September 3, 2004.

*Standard of Review*

Federal Rule of Civil Procedure 56(c) provides summary judgment may be granted if, drawing all inferences in favor of the nonmoving party, "the pleadings, discovery and disclosure materials on file, and any affidavits show that there is a genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). A motion for summary judgment will not be defeated by the mere existence of some disputed facts, but will be defeated when there is a genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. Id. at 249. The court is to draw all reasonable inferences in favor of the nonmoving party. El v. Se. Pa. Transp. Auth., 479 F.3d 232, 238 (3d Cir. 2007) ("In considering the evidence, the court should draw all reasonable inferences against the moving party."). The United States Court of Appeals for the Third Circuit has stated:

> [I]f there is a chance that a reasonable factfinder would not accept a moving party's necessary propositions of fact, pre-trial judgment cannot be granted. Specious objections will not, of course, defeat a motion for summary judgment, but real questions about credibility, gaps in the evidence, and doubts as to the sufficiency of the movant's proof, will.

Id. The court may consider material evidence that would be admissible or usable at trial in deciding the merits of a motion for summary judgment. Horta v. Sullivan, 4 F.3d 2, 8 (1st Cir. 1993) (citing 10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2721, at 40 (2d ed. 1983)); Pollack v. City

of Newark, 147 F. Supp. 35, 39 (D.N.J. 1956), aff'd, 248 F.2d 543 (3d Cir. 1957) ("[I]n considering a motion for summary judgment, the court is entitled to consider exhibits and other papers that have been identified by affidavit or otherwise made admissible in evidence.").

### *Discussion*

Plaintiff asserts the following claims: (1) race-based hostile work environment in violation of the PHRA (count I); (2) retaliation in violation of the PHRA (count II); (3) race-based discrimination in violation of the PHRA (count III); and (4) race-based hostile work environment, retaliation, and race-based discrimination, pursuant to § 1981 (count IV).

Defendants argue they are entitled to summary judgment with respect to all plaintiff's claims. With respect to the PHRA claims against Brush, defendants argue plaintiff failed to exhaust his administrative remedies with respect to Brush, and summary judgment should be granted in defendants favor. (Defs.' Br. (Docket No. 23), at 19.) With respect to count IV, defendants contend plaintiff did not file his § 1981 claims in a timely manner and the claims are barred by the statute of limitations. (Id. at 1 n.1.) With respect to counts I and IV, defendants argue plaintiff was not subjected to a hostile work environment because plaintiff did not suffer intentional discrimination due to his race, and the discrimination was not pervasive and regular. (Id. at 4 n.4.) With respect to counts II and IV, defendants dispute the causal connection between plaintiff's protected activity and any alleged acts of retaliation. (Id. at 9.) With respect to counts III and IV, defendants argue there is no adverse employment action because the Qatar

position was withdrawn and plaintiff cannot show pretext and plaintiff's resignation was voluntary.  (Id. at 9, 18.)

## I.    PHRA claims against Brush

Defendants allege the PHRA claims against Brush should be dismissed because plaintiff failed to file the requisite PHRC administrative charge against Brush.  In an administrative complaint filed with the PHRC, a plaintiff must, among other things, provide the name and address of the respondent charged, the alleged violation, and the particulars of the charge.  43 PA. CONS. STAT. § 959.  If a party is not a named respondent in the charge, the plaintiff is prevented from later filing a lawsuit against that party alleging violations of the PHRA.  See Urey v. East Hempfield Twp., No. 08-5346, 2009 WL 561664, at *3 (E.D. Pa. Mar. 4, 2009) ("Title VII and/or PHRA claims may only be brought against a party named as a 'respondent' in the administrative action.  The purpose of this rule is to alert the implicated parties and to encourage an informal conciliation process in lieu of trial.") (citations omitted).

The Court of Appeals for the Third Circuit has promulgated an exception to the "named respondent" rule to PHRC administrative filings.  In Glus v. G.C. Murphy Co., 562 F.2d 880 (3d Cir. 1977), the court outlined a four-part test to consider when a plaintiff fails to name a party in an EEOC or PHRC administrative filing:

> 1) whether the role of the unnamed party could through reasonable effort by the complainant be ascertained at the time of the filing of the EEOC complaint; 2) whether, under the circumstances, the interests of a named [sic] are so similar as the unnamed party's that for the purpose of obtaining voluntary conciliation and compliance it would be unnecessary to include the unnamed party in the EEOC proceedings; 3) whether its absence from the EEOC proceedings resulted in actual prejudice to the interests of the unnamed party; 4) whether the unnamed party has in

> some way represented to the complainant that its
> relationship with the complainant is to be through the
> named party.

Id. at 888, vacated on other grounds, 451 U.S. 935 (1981).[5]

Here, plaintiff did not name Brush as a respondent in any of his three PHRA complaints. The court must therefore consider the Glus factors. Considering the first factor, the undisputed evidence shows plaintiff knew Brush could have been listed as a respondent as early as his first PHRA complaint in May 2004. This complaint followed Brush's threats to fire plaintiff in early April 2004. Under the second factor, there is no evidence to suggest the interests of Brush and CMU are so similar that naming Brush would be unnecessary. Brush's supervisory role does not automatically implicate him in an employee's discrimination claims against his employer. Urey, 2009 WL 561664, at *4. The third factor is somewhat neutral because plaintiff's failure to include Brush as a named respondent in the administrative complaints may or may not have prejudiced Brush. The PHRC determination arguably was not adverse to Brush even though he did not have notice of the claims and an opportunity to prepare a defense. See Id. For the final factor, there was no evidence adduced demonstrating Brush represented to plaintiff that their relationship was to be through CMU.

Plaintiff did not adduce sufficient evidence to satisfy the Glus filing exception and no reasonable jury could conclude otherwise. Summary judgment must be entered in favor of Brush with respect to plaintiff's PHRA claims. Plaintiff's § 1981 claims against Brush remain, because plaintiff was not required to file an administrative complaint prior to commencing suit against Brush for those claims. See Waters v. Genesis Health Ventures,

---

[5] In Schafer v. Board of Public Education of School District of Pittsburgh, 903 F.2d 243 (3d Cir. 1990), the court of appeals reaffirmed the Glus four-factor test. Id. at 252.

Inc., No. 03-2909, 2004 WL 2958436, at *5 (E.D. Pa. Dec. 21, 2004) ("section 1981 does

not require filing an administrative complaint prior to commencing suit").

## II.     Timeliness of § 1981 and PHRA claims

### A.  § 1981 claims

Section 1981 does not contain a statute of limitations.  The relevant statutory

language provides:

### § 1981. Equal Rights under the law

(a) **Statement of Equal Rights.** All persons within the
jurisdiction of the United States shall have the same right in
every State and Territory to make and enforce contracts, to
sue, be parties, give evidence, and to the full and equal
benefit of all laws and proceedings for the security of
persons and property as is enjoyed by white citizens, and
shall be subject to like punishment, pains, penalties, taxes,
licenses, and exactions of every kind, and to no other.

(b) **"Make and enforce contracts" defined.** For purposes of
this section, the term "make and enforce contracts"
includes the making, performance, modification, and
termination of contacts, and the enjoyment of all benefits,
privileges, terms, and conditions of the contractual
relationship.

(c) **Protection against impairment.** The rights protected by
this section are protected against impairment by
nongovernmental discrimination and impairment under
color of State law.

42 U.S.C. § 1981.  Subsections (b) and (c) were added by Congress as part of the Civil

Rights Act of 1991, which was signed into law by President George H.W. Bush on

November 21, 1991.  Civil Rights Act of 1991, Pub. L. No. 102-166, § 1745, 105 Stat.

1071, 1072 (1991).  These subsections were added because prior to the amendments, §

1981 did not expressly prohibit discriminatory conduct occurring after the formation of a

contract.  See Patterson v. McLean Credit Union, 491 U.S. 164, 179 (1989) (holding post-formation conduct, while reprehensible, was not actionable under § 1981).

Before a federal catchall statute of limitations was enacted in 1990, the Supreme Court instructed courts to apply the most appropriate state statute of limitations for violations of § 1981.  Goodman v. Lukens Steel Co., 482 U.S. 656, 660 (1987).  The Court characterized § 1981 claims as personal injury claims for statute of limitations' purposes.  Id.  In Pennsylvania, the applicable limitations period for personal injury actions is two years.  42 PA. CONS. STAT. § 5524(2), (7).

On December 1, 1990, Congress enacted a federal "catchall" four-year statute of limitations applicable to any "civil action arising under an Act of Congress enacted after the date of the enactment of this section." 28 U.S.C § 1658 ("§ 1658").  The four-year federal catchall statute of limitations applies to alleged violations of § 1981 that arise, or are made possible by, the 1991 amendments.  Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 382 (2004) (holding a cause of action "arises under an Act of Congress enacted" after December 1, 1990, and is therefore governed by § 1658's four-year statute of limitations, if the plaintiff's claim was made possible by a post-1990 enactment).  Claims brought under the original provisions of § 1981 are still subject to Pennsylvania's two-year statute of limitations in accordance with Goodman.  Id.

The parties do not dispute plaintiff's claims are subject to the four-year statute of limitations under § 1658.  (Defs.' Br. at 1 n.1; Pl.'s Br. (Docket No. 37.) at 19.)  Defendants argue plaintiff's § 1981 claims are time-barred because the complaint was filed with this court on September 3, 2008.  (Defs.' Br. at 1 n.1.)  Defendants argue the alleged discriminatory actions occurred before September 3, 2004.  Plaintiff argues the

constructive discharge triggered the continuing violation doctrine and all his § 1981 claims were timely raised.

Where discriminatory conduct occurred prior to the filing period, but the plaintiff can demonstrate it was part of an ongoing pattern or practice of discrimination, the claim is not time-barred. West v. Phila. Elec. Co., 45 F.3d 744, 754 (3d Cir. 1995). To establish that an otherwise time-barred claim benefits from the continuing violation doctrine, a plaintiff must (1) demonstrate that at least one act occurred within the filing period, and (2) establish that the harassment is "more than the occurrence of isolated or sporadic acts of intentional discrimination." Id. at 754-55. "The relevant distinction is between the occurrence of isolated, intermittent acts of discrimination and a persistent, on-going pattern." Id.

The Supreme Court has stated that "discrete discriminatory acts" are not actionable if they are time-barred, even when related to acts alleged within the statutory period. Nat'l R.R. Co. v. Morgan, 536 U.S. 101, 114 (2002). The Court in Morgan explained:

> Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable "unlawful employment practice." [Plaintiff] can only file a charge to cover discrete acts that "occurred" within the appropriate time period.

Morgan, 536 U.S. at 114. The Supreme Court distinguished "discrete acts" of unlawful discrimination, which are individually actionable, from "hostile [work] environment" claims, which are based on the totality of a series of acts that may not be independently actionable. Id. at 115. Because a hostile work environment is itself an "unlawful

employment practice," the Court held in <u>Morgan</u> that so long as one act contributing to the claim occurred within the statutory period, "the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." <u>Id.</u> at 117.

The Court of Appeals for the Third Circuit in <u>O'Connor v. City of Newark</u>, 440 F.3d 125 (3d Cir. 2006), concluded the distinction between "discrete acts" and "continuing violations" made in <u>Morgan</u> is "a generic feature of federal employment law," rather than "an artifact of Title VII." <u>Id.</u> at 128. The court of appeals explained:

> <u>Morgan</u> held simply that causes of action that can be brought individually expire with the applicable limitations period. By contrast, the "hostile workplace environment" theory is designed explicitly to address situations in which the plaintiff's claim is based on the cumulative effect of a thousand cuts, rather than on any particular action taken by the defendant. In such cases, obviously the filing clock cannot begin running with the first act, because at that point the plaintiff has no claim; nor can a claim expire as to that first act, because the full course of conduct is the actionable infringement. The Court did nothing more than to restate, in the employment discrimination context, the common-sense proposition that an applicable statute of limitations begins to run at the time the claim accrues, and that time-barred claims cannot be resurrected by being aggregated and labeled continuing violations.

<u>O'Connor</u>, 440 F.3d at 128-29 (internal citations omitted). The continuing violation doctrine, as explained in <u>West</u>, and the "discrete acts" distinction made in <u>Morgan</u>, are relevant to plaintiff's § 1981 claims.

**1. Plaintiff's § 1981 race-based discrimination claim implicating a failure to promote is time-barred.**

Plaintiff's race-based discrimination claim implicating a failure to promote cannot be saved by the continuing violation doctrine because a failure to promote is a "discrete

discriminatory act." Morgan, 536 U.S. at 114. Plaintiff applied for the risk management specialist position at CMU's Qatar campus in late March 2004. On August 27, 2004, the position was withdrawn because CMU management believed the job responsibilities could be fulfilled using employees currently employed at the Pittsburgh campus. Because the position was withdrawn on August 27, 2004, this discrete act is outside the four-year statute of limitations period. Plaintiff's § 1981 race-based discrimination claim implicating a failure to promote is time-barred.

### 2. Plaintiff's remaining § 1981 claims

Defendants argue plaintiff can recover on his § 1981 claims only for incidents that occurred within the four-year statutory period after September 3, 2004. Plaintiff asserts the Supreme Court's decision in Morgan allows him to recover for events that occurred before September 3, 2004 because those acts relate to events that occurred within the limitations period. The only discriminatory acts that allegedly occurred on or after September 3, 2004 were plaintiff's constructive discharge and the continued probationary period until September 30, 2004.[6] First, the court will need to determine when plaintiff's alleged constructive discharge occurred. If plaintiff's alleged constructive discharge occurred on or after September 3, 2004, then a discriminatory act fell within the limitations period, and plaintiff's remaining § 1981 claims are considered timely for purposes of resolving the motion for summary judgment.

The Court of Appeals for the Third Circuit has not addressed when the limitations period begins to run on a claim for which a constructive discharge is the adverse action. See Fiorucci v. City of Wilkes-Barre, No. 06-1084, 2007 WL 800848, at *3 (M.D. Pa.

---

[6] Defendants conceded in their memorandum of law in support of their motion for summary judgment (Docket No. 23) that plaintiff's § 1981 constructive discharge "claim" was timely filed. (Defs.' Brief in Supp. (Docket No. 23) at 1 n.1.)

Mar. 14, 2007). Other circuits, however, have held the statute of limitations for such a claim accrues on the date a plaintiff gives notice of his or her resignation. See Flaherty v. Metromail Corp., 235 F.3d 133, 137-39 (2d Cir. 2000) (holding the date the plaintiff's claim accrued was the date she gave definite notice of her intent to retire, noting the rule should be the same in all cases of constructive discharge); Draper v. Coeur Rochester, Inc., 147 F.3d 1104, 1110 (9th Cir. 1998) (explaining the plaintiff's claim was timely filed if the date of her resignation fell within the limitations period). In Flaherty and Draper the plaintiffs alleged discriminatory incidents, other than their resignation, that fell within the limitations period. See Flaherty, 235 F.3d at 136-37 (the plaintiff's hostile work environment claim was time-barred if it accrued prior to April 15, 1997; the plaintiff submitted her resignation letter on June 12, 1997 alleging her supervisor refused to meet with her in May 1997); Draper, 147 F.3d at 1109 (the plaintiff's hostile work environment claim was time-barred if it accrued prior to November 19, 1994; the court held the plaintiff's claim was not time-barred because the plaintiff raised a genuine issue concerning whether a confrontation with a co-worker on December 7, 1994 was an act of discrimination).

In Gary v. Washington Metropolitan Transit Authority, 886 F. Supp. 78 (D.D.C. 1995), the court held claims implicating a constructive discharge do not necessarily accrue on the date the plaintiff elects to resign. Gary, 886 F. Supp. at 91. The court reasoned: "Under this theory, a plaintiff could set the date on which the statute of limitations would begin to run, no matter how much time had elapsed since the acts complained of." Id. The court held the statute of limitations begins to run on the date the plaintiff "knew or should have known of [his or] her inability to return to work," which is

a question of fact. Id. Relying on the reasoning in Gary, the court in Velikonja v.

Gonzalez, No. 04-1001, 2005 WL 6164807, at *6 (D.D.C. June 30, 2005), held the

statute of limitations on the plaintiff's claim implicating a constructive discharge accrued

on his last day of work; not the date he submitted his letter of resignation. Id. The court

explained the plaintiff's working conditions could not possibly have become intolerable

during the period of time, i.e., inside the limitations period, when the plaintiff was not

going to work. Id. The court concluded the statute of limitations barred the plaintiff's

claim because the plaintiff did not aver a discriminatory act occurred within the

limitations period to trigger the continuing violation doctrine. Id.

　　　Two district courts within the Third Circuit have addressed this issue. In Graham

v. Avella Area School District, No. 05-1344, 2006 WL 1669881, at *4 (W.D. Pa. June

14, 2006), the plaintiff submitted her resignation letter on April 21, 2004, completed her

last day of work on June 30, 2004, and filed her charge of discrimination on April 25,

2005. The defendant in Graham argued the accrual date should have been the plaintiff's

resignation date on April 21, 2004, making her claim time-barred because she filed her

complaint with the PHRC more than one year after her resignation. Id. The plaintiff

argued the accrual date was the date of her last day of work on June 30, 2004, which fell

within the limitations period. Id. Relying on the reasoning in Flaherty, the court held the

accrual date was April 21, 2004, the day the plaintiff submitted her resignation letter,

because that was the date the plaintiff knew about her injury and, therefore, was the date

her claims accrued. Id.

　　　In Gerhart v. Boyertown Area School District, No. 00-5914, 2002 WL 31999365,

at *4 (E.D. Pa. Mar. 4, 2002), the court held the accrual date for the plaintiff's claim

implicating a constructive discharge was the date she submitted her letter of resignation. Id. The court rejected the plaintiff's argument that the accrual date should be the date the plaintiff's retirement became effective, which was *after* she submitted her letter. Id. The court relied on the reasoning in Flaherty, stating: "'In the case of constructive discharge, it is only the employee who can know when the atmosphere has been made so intolerable by the discrimination-motivated employer that the employee must leave.'" Id. at *4 n.9 (citing Flaherty, 235 F.3d at 138). In Gerhart, the plaintiff knew about the intolerable atmosphere when she submitted the resignation letter, not when the retirement became effective. Id. at *4.

Plaintiff argues the constructive discharge occurred during the relevant statutory period, which triggers the continuing violation doctrine. A constructive discharge occurs when an employer is aware that an employee was subjected to a continuous pattern of discrimination about which the employer does nothing to stop. Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1084-85 (3d Cir. 1996). A constructive discharge is a "discriminatory act" for purposes of Morgan. See Draper v. Couer Rochester, Inc., 147 F.3d 1104, 1110 (9th Cir. 1998); Young v. Nat'l Ctr. for Health Servs. Research, 828 F.2d 235, 237-38 (4th Cir. 1987); Miles v. Pa. Dep't of Conservation and Natural Res., No. 08-1561, 2009 WL 506371, at *5 (M.D. Pa. Feb. 27, 2009). Plaintiff's last day at work was September 3, 2004. Under the Flaherty rationale, the alleged constructive discharge was within the limitations period. Alternatively, plaintiff sent his first letter of resignation on October 18, 2004 – also within the limitations period. Under either line of cases discussed above, plaintiff's § 1981 claims implicating a constructive discharge would be timely filed if the constructive discharge meets the framework set forth in Berry

v. Board of Supervisors of Louisiana State University, 715 F.2d 971 (5th Cir. 1983), to determine whether a continuing violation existed.  See Cowell v. Palmer Twp., 263 F.3d 286, 292 (3d Cir. 2001).

The court of appeals in Berry enumerated three factors to consider:

> (1) subject matter – whether the violations constitute the same type of discrimination, tending to connect them in a continuing violation; (2) frequency – whether the acts are recurring or more in the nature of isolated incidents; and (3) degree of permanence – whether the act had a degree of permanence which should trigger the plaintiff's awareness of and [sic] duty to assert his/her rights and whether the consequences of the act would continue even in the absence of a continuing intent to discriminate.

Cowell, 263 F.3d at 292 (citing Berry, 715 F.2d at 981). The degree of permanence factor is the most important.  Id.

Turning to the first Berry factor, plaintiff adduced sufficient evidence that the subject matter of the hostile work environment and retaliation he experienced at CMU outside and during the limitations period was of the same type.  The alleged acts of discrimination include: (1) a verbal warning including being threatened to be fired on April 2, 2004; (2) Brush's email stating his intent to fire plaintiff; (3) a "second warning" memorandum on April 23, 2004; (4) a probationary letter on April 26, 2004; (5) a poor performance evaluation on July 8, 2004; (6) denial of leave on July 8, 2004; (7) clearing plaintiff's work station and denying plaintiff access to the ACIS server while on PTO; (8) continued probation from August 29, 2004 through September 30, 2004; and (9) denial of permission to take an early lunch on September 2, 2004.  A reasonable jury could conclude that plaintiff's constructive discharge was caused by the same on-going

discriminatory conduct from April 2004 through September 2004 as the conduct which formed the basis of his hostile work environment and retaliation claims.

Turning to the second Berry factor, plaintiff adduced sufficient evidence that the discrimination was continuous. Courts have not set a specific standard for determining how close together the acts must occur to amount to a continuing violation. Cowell, 263 F.3d at 295. The kind of acts that would satisfy the "frequency" factor of the Berry inquiry, however, must at least be acts of substantially similar nature to those which were the basis of the original claim. Id.

The time between the initial alleged acts of discrimination in April 2004 and the alleged constructive discharge on September 3, 2004 was about six months. The longest break between discriminatory acts occurred between July 8, 2004 and August 23, 2004. The court concludes plaintiff adduced sufficient evidence to raise a genuine question for the jury to determine whether the events were persistent acts of on-going discrimination sufficient to satisfy the frequency factor under Berry.  Compare West, 45 F.3d at 755-56 (the frequency factor was satisfied when the discriminatory events occurred consistently with increased frequency over time); with Sicalides v. Pathmark Stores, Inc., No. 99-3465, 2000 WL 760439, at *5 (E.D. Pa. June 12, 2000) (three-month intervening period between incidents prevented the plaintiff from satisfying the frequency factor).

Plaintiff presented sufficient facts to raise a genuine issue of material fact about whether the acts of discrimination had a degree of permanence such that he should have been aware of a duty to assert his rights before September 3, 2004 – the date of the alleged adverse employment action.  The court notes plaintiff filed his EEOC and PHRC complaints in May 2004, based upon the alleged discriminatory conduct that occurred

prior to his filings. While the discriminatory conduct was sufficient to generate plaintiff's complaints, the constructive discharge relating to the hostile work environment occurred within the statutory limitations period. Compare DeVito v. Bd. of Educ. of City of Newark, 29 F. App'x 886, 889 (3d Cir. 2002) (holding the plaintiff's employment discrimination complaints buttressed the finding that discrete instances of discrimination had the requisite degree of permanence); with Rush v. Scott Specialty Gases, Inc., 113 F.3d 476, 483 (3d Cir. 1997) (holding continuing violation existed after EEOC charge was filed when the harassment intensified and plaintiff "did not realize early on how pervasive or severe the harassment was").

Because the court finds that a genuine issue of material fact exists with respect to whether there was a continuing violation from April 2004 to September 3, 2004, plaintiff's § 1981 claims for retaliation and hostile work environment were timely filed.

### B. PHRA claims

The PHRA requires a claim be brought first to an administrative agency, the PHRC, which has exclusive jurisdiction over the claim for one year in order to investigate the matter. Burgh v. Borough Council of Borough of Montrose, 251 F.3d 465, 471 (3d Cir. 2001). The administrative charge must be filed with the PHRC within 180 days of the alleged discrimination. 43 PA. CONS. STAT. § 959(h). Once the administrative complaint is filed, a complainant may not file an action in court for one year. Id. If the PHRC does not resolve the administrative complaint within one year, it is required to notify the complainant that he may bring an action in the court of common pleas. Id.; 43 PA. CONS. STAT. § 962(c)(1). The complainant is not required to bring an action within any limitations period, Burgh, 251 F.3d at 476, unless the PHRC notifies

the complainant that it is closing the complaint. If the PHRC provides that kind of notice, the complainant has two years from the date notice was sent to bring a civil action. 43 PA. CONS. STAT. § 962(c)(2).

Plaintiff filed his first administrative charge with the PHRC on May 18, 2004. Under the rationale of <u>Burgh</u>, plaintiff *could have* filed this civil action beginning May 18, 2005. Plaintiff, however, did not receive a letter from the PHRC until June 3, 2008, stating his complaint had been dismissed by the commission. Plaintiff, therefore, had until June 3, 2010, to file his complaint with this court. Because plaintiff filed his complaint on September 3, 2008, his PHRA raced-based hostile work environment and retaliation claims were timely filed.

Plaintiff filed his first PHRC complaint prior to the alleged failure to promote him on August 27, 2004. Plaintiff filed his second PHRC complaint on December 20, 2004. While this complaint was filed after the alleged failure to promote, the complaint only asserts incidents of retaliation and harassment. The December 20, 2004 PHRC complaint did not raise any claim implicating a failure to promote.

Plaintiff filed his third and final PHRC complaint on July 11, 2005. Plaintiff filed this complaint after the alleged failure to promote, but the filing of the complaint was not timely made. Under the PHRA, a claimant must file a charge within 180 days of the alleged discrimination. 43 PA. CONS. STAT. § 959(h). Since the failure to promote occurred at the latest on August 27, 2004, the date the job posting was withdrawn, the filing of the charge was more than 315 days after the failure to promote and was therefore beyond the relevant 180-day period. Plaintiff did not file any timely charge with the PHRC with respect to this claim. Plaintiff, therefore, failed to exhaust his administrative

remedies with respect to his PHRA race-based discrimination claim implicating a failure to promote, and summary judgment must be granted in favor of defendants with respect to that claim.

## III.     Sufficiency of facts to raise a genuine issue

### A.  Counts I and IV – race-based hostile work environment

#### i.        Burden-shifting framework

Plaintiff asserted race-based hostile work environment claims under § 1981 (count IV) and the PHRA (count I).[7]  Defendants argue these claims fail as a matter of law because plaintiff failed to adduce evidence to demonstrate the incidents of alleged harassment (1) were motivated by his race, (2) were severe or pervasive, or (3) would have detrimentally affected a reasonable person of the same race.

In cases where the plaintiff lacks direct evidence of discrimination, the Court of Appeals for the Third Circuit has applied the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  See Barber v. CSX Distrib. Servs., 68 F.3d 694, 698 (3d Cir. 1995).

A plaintiff must establish first a prima facie case of discrimination. McDonnell Douglas, 411 U.S. at 802.  If a plaintiff successfully proves a prima facie case of discrimination, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment decision. Simpson v. Kay Jewelers Div. of Sterling, Inc., 142 F.3d 639, 644 n.5 (3d Cir. 1998). The defendant may satisfy its burden by offering evidence of a nondiscriminatory reason for its action.  Fuentes v.

---

[7] Plaintiff's claims under the PHRA and § 1981 will be analyzed similarly, as the elements of these claims are generally identical.  Brown v. J. Kaz, Inc., 581 F.3d 175, 181 (3d Cir. 2009); Goosby v. Johnson & Johnson Med., Inc., 228 F.3d 313, 317 n.3 (3d Cir. 2000); Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410 (3d Cir. 1999); see Whitmire v. Kvaerner Phila. Shipyard, 340 F. App'x 94, 98 n.1 (3d Cir. 2009).

Perksie, 32 F.3d 759, 763 (3d Cir. 1994). Once the defendant offers a legitimate reason

for the conduct in question, the burden shifts back to the plaintiff to prove by a

preponderance of the evidence that the legitimate reasons offered by the defendant were

not its true reasons, but were pretext for discrimination. Jones v. Sch. Dist. of Phila., 198

F.3d 403, 410 (3d Cir. 1999). This "scheme of proof" set forth in McDonnell Douglas

applies to claims under § 1981 and the PHRA. See Jones, 198 F.3d at 410.

### ii. Prima facie case

To allege a successful hostile work environment claim, "'the harassment must be

so severe or pervasive that it alters the conditions of the victim's employment and creates

an abusive environment.'" Grassmyer v. Shred-It USA, Inc., No. 09-3876, 2010 WL

3330102, at *11 (3d Cir. Aug. 25, 2010) (slip opinion) (citing Weston v. Pennsylvania,

251 F.3d 420, 426 (3d Cir. 2001). A plaintiff must establish five factors to bring a hostile

work environment claim: (1) the plaintiff suffered intentional discrimination because of

race; (2) the discrimination was pervasive and regular; (3) the discrimination

detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a

reasonable person of the same race, and (5) the existence of respondeat superior liability.

Aman, 85 F.3d at 1081.[8]

To determine whether the plaintiff can establish each element of his or her prima

facie case, the district court examines the "overall scenario" in which the alleged

discrimination occurred. Cardenas v. Massey, 269 F.3d 251, 261 (3d Cir. 2001). In

Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993), the Supreme Court stated:

---

[8] The constructive discharge would be relevant to a § 1981 hostile work environment claim involving a
tangible employment action. If a tangible employment action like a constructive discharge is proven by a
plaintiff, the employer will not have the affirmative defense of reasonable care available to defeat the
plaintiff's claim. See note 1 supra.

> Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive-is beyond [§ 1981's] purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no [§ 1981] violation.

Harris, 510 U.S. at 21-22.

In determining whether a work environment is hostile, the court considers factors including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23.

The court will only address the first element – intentional discrimination because of membership in a protected class – because it is dispositive.

Racial discrimination in the workplace manifests itself in two forms: overt discriminatory conduct and facially neutral conduct. Cardenas, 269 F.3d at 261. Either form may support a plaintiff's hostile work environment claim. Id. The Supreme Court stated: "[T]he critical issue . . . is whether members of one sex [or race] are exposed to disadvantageous terms or conditions of employment to which members of the other sex [or race] are not exposed." Harris, 510 U.S. at 25. "[T]he advent of more sophisticated and subtle forms of discrimination requires that [courts] analyze the aggregate effect of all evidence and reasonable inferences therefrom, including those concerning incidents of facially neutral mistreatment, in evaluating a hostile work environment claim." Cardenas, 269 F.3d at 262. The plaintiff, however, must show some overt racially hostile words or conduct to signal the invidious nature of the facially neutral conduct. Aman, 85 F.3d at

1083; <u>Brooks v. CBS Radio Inc.</u>, No. 07-0519, 2007 WL 4454312, at *12 (E.D. Pa. Dec. 17, 2007).

Plaintiff avers eleven incidents of facially neutral discriminatory conduct: (1) Brush's threat to fire plaintiff if he did not stop discussing "personnel issues" with co-workers; (2) Brush's email to Tademy stating "I will be initiating an involuntary termination in the department;" (3) the memorandum entitled "Department Discussions – Second Warning" concerning plaintiff discussing "personnel issues;" (4) probation; (5) two training sessions that were "ill-designed" and not suitable for plaintiff's skill level; (6) plaintiff's supervisors demanded to know his last day at work; (7) denying plaintiff a leave of absence to move his family to Qatar; (8) removal of his name from the ACIS network and reassigned and reconfigured office; (9) extension of probation to September 30, 2004; (10) a new work assignment in September 2004 and Rigdon leaving for a brief vacation; and (11) CMU denying plaintiff's request for an early lunch to attend a doctor's appointment.

Those incidents do not implicate race. Although plaintiff provides ample evidence of defendants' facially neutral conduct, he provides no evidence of overtly racial comments or conduct from which a reasonable jury could conclude he suffered intentional discrimination because of race. For example, in <u>Cardenas</u>, the plaintiff's supervisor called the plaintiff "the boy from the barrio" and posted "majodo," meaning "wetback," on his cubicle wall. <u>Cardenas</u>, 269 F.3d at 258. The court of appeals held in light of the facially discriminatory comments concerning plaintiff's race, the facially neutral management decisions complained of constituted evidence sufficient to draw an inference the neutral conduct was discriminatory. <u>Id.</u> at 262. The court of appeals

reached a contrary result in <u>Caver v. City of Trenton</u>, 420 F.3d 243 (3d Cir. 2005), where the plaintiff produced evidence that co-workers stated it was "okay to be in the KKK," and racial flyers and graffiti had been placed around the department. The court of appeals held the facially discriminatory conduct was not directed at the plaintiff, because he heard about the flyers and graffiti from a second-hand source. Under those conditions a reasonable jury could not conclude the facially neutral conduct about which the plaintiff complained was discriminatory, and the plaintiff could not establish the first element of his prima facie case. <u>Caver</u>, 420 F.3d at 263.

Here, plaintiff provided no evidence of any overtly racial comments or conduct by defendants directed towards him or others. Therefore, a reasonable jury could not conclude the facially neutral incidents about which he complains were racially motivated. Because plaintiff failed to adduce sufficient evidence with respect to the first element of his prima facie case, the other elements need not be considered. Defendants' motion for summary judgment will be granted with respect to plaintiff's § 1981 and PHRA hostile work environment claims.

### B. Counts II and IV – retaliation claims

Ilori asserted retaliation claims under § 1981 and the PHRA (counts II and IV). Defendants argue these claims fail as a matter of law because plaintiff failed to adduce sufficient evidence to demonstrate (1) a causal nexus between the protected activity and the adverse action, and (2) defendants' actions were pretextual. The <u>McDonnell Douglas</u> burden-shifting analysis is applicable to these claims. <u>Brown v. J. Kaz, Inc.</u>, 581 F.3d 175, 186 (3d Cir. 2009) ("Title VII-style burden shifting naturally controls in § 1981 cases."); <u>see</u> <u>Jones</u>, 198 F.3d at 410.

### i.     Prima facie case

To establish a prima facie case of retaliation under § 1981 and the PHRA, a plaintiff must show that (1) he or she engaged in protected activity, (2) the employer took an adverse employment action after or contemporaneous with the protected activity, and (3) a causal link exists between the protected activity and the adverse action. Weston, 251 F.3d at 430; Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279 (3d Cir. 2000).

### a.  Protected activity

The first prong of the prima facie case requires at least an informal complaint of discriminatory employment practices.  Barber v. CXS Distrib. Serv., 68 F.3d 694, 701-02 (3d Cir. 1995) (citing Sumner v. United States Postal Serv., 899 F.3d 203, 209 (2d Cir. 1990) (acceptable forms of protected activity under Title VII include formal complaints "as well as informal protests of discriminatory employment practices, including making complaints to management, writing critical complaints to customers, protesting against discrimination by industry or society in general, and expressing support of co-workers who have filed formal charges")). The complaint, whether verbal or written, must specifically relate to the protected conduct being infringed. Barber, 68 F.3d at 701; see Jones v. WDAS FM/AM Radio Stations, 74 F. Supp. 2d 455, 463-64 (E.D. Pa. 1999).

Defendants admit plaintiff's letter to president Cohon was protected activity. Defendants assert, however, that the letter was not received until April 12, 2004, while plaintiff alleges he delivered the letter to the president's office on April 5, 2004. Viewing the facts in the light most favorable to plaintiff, the letter was delivered to the president's office on April 5, 2004.

Even if the letter was delivered on April 12, 2004, plaintiff adduced sufficient evidence to establish the first element of his retaliation claims without the letter. It is undisputed plaintiff told Brush on April 5, 2004 he was going to the president to complain about the alleged discrimination. This conduct is considered an informal complaint to management and would qualify as protected activity on its own. See Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc., 450 F.3d 130, 135 (3d Cir. 2006) (informal complaints communicated to management constitute protected activity). The first prong of plaintiff's prima facie case for retaliation is satisfied.

### b. Adverse employment action

Prior to 2006, the term "adverse employment action" was understood to refer to a "significant change in employment status, such as hiring, firing, failing to promote, reassignment, or a decision causing significant change in benefits." Weston, 251 F.3d at 430-31. In 2006, the Supreme Court determined that the antiretaliation provision of Title VII extended beyond those kinds of employment-related actions. See Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S. 53, 67 (2006). A plaintiff must show a reasonable employee would have found the challenged action materially adverse, "which in this context means it might well have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Burlington Northern, 548 U.S. at 68 (quoting Rochon v. Gonzalez, 438 F.3d 1211, 1217-18 (D.C. Cir. 2006).

An employment action is materially adverse when it is a significant rather than a trivial harm. Burlington Northern, 548 U.S. at 68. "[A]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." Id.

(citing 1 BARBARA LINDEMANN & PAUL GROSSMAN, EMPLOYMENT DISCRIMINATION LAW 669 (3d ed. 1996) (explaining "courts have held that personality conflicts at work that generate antipathy" and "'snubbing' by supervisors and co-workers" are not actionable)). Antiretaliation provisions seek to provide plaintiffs with "unfettered access to statutory remedial mechanisms." Robinson v. Shell Oil Co., 519 U.S. 337, 346 (1997). The provisions achieve this goal by prohibiting employer action that is likely "to deter victims of discrimination from complaining to the [enforcing agency]." Id. at 346. "[P]etty slights, minor annoyances, and simple lack of good manners will not create such deterrence." Burlington Northern, 548 U.S. at 68.

Plaintiff alleges several adverse employment actions occurred in retaliation for his informing Brush he was going to complain to the president. The actions were: (1) Brush's email explaining his desire to initiate a discharge shortly after plaintiff's protected activity, and telling his staff to "move forward with either the probation letter or involuntary termination" (Pl.'s App., Tab 2 Ex. 2.1); (2) a warning letter from Blair and probationary actions by CMU; (3) poor performance evaluations; (4) Brush telling plaintiff if plaintiff did not resign Brush would pick a date for plaintiff to resign; and (5) overall hostile work environment.[9] The court will analyze each alleged adverse employment action.

### i.   email, warning letter, and probation

On April 5, 2004, Brush sent an email to Tademy one hour after plaintiff told Brush he was filing a complaint with the president. Brush's email stated: "I will be

---

[9] Brush's threat to fire plaintiff on April 2, 2004 will not be considered because plaintiff's protected activity did not occur until April 5, 2004. See Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 272 (2001) (when adverse employment action occurs prior to plaintiff's protected activity there is "no evidence whatsoever of causality").

initiating an involuntary personnel termination in the department (ACIS); any advice?" (Pl.'s App., Tab 2 Ex. 2.4.) The same day, Brush called Tademy and mentioned he was upset and wanted to fire plaintiff. After Brush and Blair communicated about plaintiff's termination, Blair contacted Hey and told Hey "to move forward with either the probation letter or involuntary termination." (Pl.'s App., Tab 2 Ex. 2.1.)[10]

The warning letter entitled "Departmental Discussions – Second Warning" dated April 21, 2004 advised plaintiff not to discuss personnel matters with co-workers outside plaintiff's supervisor escalation path. While plaintiff does not dispute the discussions took place, he asserts defendants did not clarify "personnel matters" in April 2004 so he could modify his behavior. (But see Defs.' App., Tab B Ex. 17 at D-0118 (plaintiff's performance review in June 2004 discussing specific inappropriate personnel discussions with co-workers).) Two days after the warning letter, plaintiff was placed on probation from April 23, 2004 to June 30, 2004 for, among other things, discussing personnel matters outside the chain of command. Importantly, plaintiff was denied a merit increase in pay as a condition of the probationary period.

In this case, the warning letter and probation, viewed collectively, constitute adverse employment actions. While plaintiff did not receive the email, have knowledge of its content, or hear Brush's statements to co-workers, the warning letter and probation are sufficient facts for a reasonable jury to conclude defendants' actions resulted in economic loss to plaintiff or impacted his employment or professional advancement. Being on probation denied plaintiff the opportunity to receive merit pay increases and,

---

[10] The record is unclear how Blair learned about Brush's desire to terminate plaintiff, and whether she spoke to Hey on her own accord or as directed by Brush.

along with the warning letter, caused plaintiff to suffer from anxiety at work, compelling plaintiff to seek counseling.

Here, plaintiff told Brush he would be complaining to the president. Plaintiff took this action before the warning letter and the probationary action occurred. Taken collectively, a reasonable jury could conclude that these actions against plaintiff several weeks after engaging in protected activity could dissuade a reasonable employee from making a charge of discrimination. See Leatherwood v. Anna's Linens Co., No. 09-15427, 2010 WL 2490753, at *4 (11th Cir. June 17, 2010) (holding the plaintiff satisfied the second prong of her prima facie case because multiple counseling notices, a negative evaluation, and a thirty-day probation constituted adverse employment actions); Petroci v. Atl. Envelope Co., LLC, No. 06-2792, 2007 WL 1993966, at * 3 (E.D. Pa. July 3, 2007) (placing an employee in a remedial program and on probation could dissuade him from participating in a lawsuit). With this evidence plaintiff satisfied the second prong of his prima facie case.

### ii.      Encouragement to resign

Brush's statements to plaintiff in July 2004 do not qualify as adverse employment actions. On July 8, 2004, plaintiff met with Brush to discuss taking leave and to determine how many vacation days he had remaining. During the meeting Brush asked plaintiff when his last day at ACIS would be. Plaintiff became confused and stated July 16, 2004 would be his "last day." Plaintiff explained he was not leaving CMU. Brush told plaintiff if he did not resign he would pick a date for him to resign, and told plaintiff his days at CMU were numbered.

While possibly relevant to whether there was a hostile work environment related to retaliation, this conduct does not rise to the level of an adverse employment action as proscribed in <u>Burlington Northern</u>.  The threat was never carried out and had no demonstrable impact on plaintiff's employment.  <u>See generally</u> <u>Sconfienza v. Verizon Pa. Inc.</u>, 307 F. App'x 619, 621-22 (3d Cir. 2008) ("formal reprimands that result in a notation in an employee's personnel file" could be considered an adverse employment action, "but harsh words that lack real consequences" do not); <u>Hellman v. Weisberg</u>, 360 F. App'x 776, 779 (9th Cir. 2009) (employer threatening the plaintiff with termination and criminal prosecution did not constitute adverse employment actions to support a Title VII claim for retaliation – the plaintiff was never fired or prosecuted).

### iii.     Hostile work environment

Plaintiff alleges the conduct which formed the basis of his hostile work environment claim was in retaliation for engaging in protected activity. The Court of Appeals for the Third Circuit has recognized a showing of a hostile work environment can satisfy the adverse employment action prong of a retaliation claim. <u>Jensen v. Potter</u>, 435 F.3d 444, 449 (3d Cir. 2006).  While no reasonable jury could find plaintiff was subjected to a race-based hostile work environment, the collective evidence of hostility arguably may satisfy the second prong of his retaliation claim.

### c.  Causal connection

Defendants argue plaintiff failed to provide sufficient evidence to establish a causal connection between his protected activity and the adverse employment action. To establish the existence of a causal connection, the court considers: (1) timing, and/or (2) evidence of ongoing antagonism. <u>Abramson v. William Patterson College of New Jersey</u>,

260 F.3d 265, 288 (3d Cir. 2001). The first factor requires a close temporal proximity between the protected activity and the adverse employment action. Id. "[T]he timing of the alleged retaliatory action must be unusually suggestive of retaliatory motive before a causal link will be inferred." Thomas v. Town of Hanmonton, 351 F.3d 108, 114 (3d Cir. 2003) (citing Estate of Smith v. Marasco, 318 F.3d 497, 512 (3d Cir. 2003)); compare Shellenberger v. Summit Bancorp, Inc., 318 F.3d 183, 189 n.9 (3d Cir. 2003) (finding a ten-day time period between the protected activity and the adverse employment action, along with evidence the supervisor made comments about plaintiff's EEOC complaint in close proximity to her discharge, was sufficient to satisfy the causation element of plaintiff's prima facie case), and Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989) (holding temporal proximity alone was sufficient to establish causation where the adverse employment action occurred two days after plaintiff's protected activity), with Williams v. Phila. Hous. Auth., 380 F.3d 751, 760 (3d Cir. 2004) (holding two months was too long to permit an inference of causation), and George v. Genuine Parts Co., No. 04-108, 2007 WL 217684, at *12 (W.D. Pa. Jan. 25, 2007) (finding suggestiveness is highly sensitive to the facts of each case, but a three-month gap "is not so close as to be unusually suggestive of retaliatory motive, especially where an obvious and unimpeached non-retaliatory motive exists"). Where temporal proximity alone is not enough to prove causation, a plaintiff can establish a causal connection by providing other types of suggestive evidence, such as a defendant's inconsistent statements and conduct. See Farrell v. Planters Lifesavers Co. 206 F.3d 271, 280-81 (3d Cir. 2000).

On April 23, 2004, CMU gave plaintiff a memorandum entitled "Department Discussions – Second Warning." The memorandum concerned plaintiff's continuing

conduct of discussing "personnel" matters with employees who were not his supervisors. Plaintiff's protected activity occurred on April 5, 2004. A reasonable jury could conclude that eighteen days between plaintiff's protected activity and defendant's adverse employment action is sufficient to establish a causal connection. The finding is supported by the evidence of ongoing antagonism, including the probationary action taken against plaintiff three days later, the denial of leave in July 2004, Brush encouraging plaintiff to resign, and the extension of probation in August 2004. Plaintiff adduced evidence sufficient to demonstrate a genuine issue of material fact with respect to whether a causal link exists between his protected activity and the adverse employment actions. The court concludes a reasonable jury could find plaintiff established a prima facie case of retaliation.

### 2. Legitimate, nonretaliatory reason

Once a plaintiff establishes a prima facie case, the burden shifts to the defendant to rebut the presumption of retaliation and produce evidence the adverse employment action was taken for reasons that are legitimate and nonretaliatory. Delli Santi v. CNA Ins. Cos., 88 F.3d 192, 199 (3d Cir. 1996). The employer satisfies its burden of production by introducing evidence which, taken as true, would permit the conclusion that a nonretaliatory reason for the adverse employment decision existed. Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994). The defendant does not need to persuade the court that it was actually motivated by the reason which it offers. Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981).

Defendants offer three reasons for the written warning given to plaintiff on April 23, 2004. First, plaintiff accused his co-worker John Zamperini of intentionally

scheduling a training course to conflict with his schedule. Second, plaintiff requested a flex-time accommodation from Rittiger, who was not his supervisor at that time. Third, plaintiff failed to satisfy his performance objectives.

On March 31, 2004, plaintiff signed a draft of performance objectives for the period March 2004 through June 2004 which included, "[b]ecome a team player" and "[b]ecome proficient developing in Oracle Forms & Reports within Oracle applications' architecture." (Defs.' App., Tab B at D-0221.) The objective regarding development of Oracle reports was also in plaintiff's March 2001, 2002, and 2003 performance reviews. On April 5, 2004, defendants gave plaintiff a revised version of the March 2004 objectives. Specifically, the objectives directed plaintiff to "become a RMIS team player." His evaluation objectives were:

> Successfully contributes to group performance by completing tasks on time and as assigned, actively participates in team discussions, accepts technical direction and mentoring from senior team members, conforms to group standards for software development . . . and resolves issues within the team structure.

(J.C.S. ¶ 27.) Plaintiff missed a regularly scheduled meeting with Rigdon on April 12, 2004 after signing the draft performance objectives. The meeting was rescheduled for April 19, 2004, and plaintiff asserts he went to Rigdon's office and Rigdon was not there.

Plaintiff was allegedly disrespectful to Rigdon during a meeting on May 28, 2004 to review his progress on the vehicles module for ACIS. On June 1, 2004, Blair sent an email to plaintiff concerning the meeting, stating:

> [Y]ou were disrespectful of your supervisor – this is not acceptable . . . you were argumentative even before the substantive discussion began . . . your behavior was extremely unprofessional affecting  your ability to get the job done . . . you must be cooperative if we can proceed

> with mentoring and training . . . meetings with your
> supervisor are designed to be constructive and informative.

(Defs.' App., Tab B Ex. 15.)  Defendants assert plaintiff's past conduct in the office,

coupled with the behavior at the May 28, 2004 meeting, contributed to the "below

expectations" rating Rigdon gave plaintiff on July 8, 2004.

Considering the burden on defendants is light, the court finds defendants set forth

sufficient legitimate, nondiscriminatory reasons for the adverse employment actions

taken against plaintiff.

### 3. **Pretext**

Once a defendant meets the low burden of establishing a legitimate, non-

retaliatory reason for the adverse employment decisions, McDonnell Douglas requires the

burden of production return to the plaintiff to show by a preponderance of the evidence

that the employer's explanation is pretextual. Fuentes, 32 F.3d at 763.  In order to survive

summary judgment the plaintiff must satisfy at least one of two prongs explained in

Fuentes:

> [T]he plaintiff must point to some evidence, direct or
> circumstantial, from which a factfinder could reasonably
> either (1) disbelieve the employer's articulated legitimate
> reasons; or (2) believe that an invidious discriminatory
> reason was more likely than not a motivating or
> determinative cause of the employer's action.

Id. at 764. By satisfying either prong, the plaintiff meets its burden of persuasion.  Id. at

763.

### a. **Prong one**

A plaintiff can satisfy the first prong, and overcome summary judgment, by

submitting evidence that would cause a reasonable fact-finder to discredit the employer's

articulated reason for the adverse employment action. Fuentes, 32 F.3d at 763. The

plaintiff does not need to produce evidence that leads the court to conclude the employer

acted for discriminatory reasons. Sempier v. Johnson & Higgins, 45 F.3d 724, 728 (3d

Cir. 1995). The plaintiff also need not produce additional evidence beyond his prima

facie case. Fuentes, 32 F.3d at 764. The plaintiff must demonstrate:

> Weaknesses, implausibilities, inconsistencies,
> incoherencies, or contradictions in the employer's proffered
> legitimate reasons [such] that a reasonable factfinder could
> rationally find them "unworthy of credence" and hence
> infer that the proffered nondiscriminatory reason "did not
> actually motivate" the employer's action.

Simpson v. Kay Jewelers Div. of Sterling, Inc., 142 F.3d 639, 644 (3d Cir. 1998)

(quoting Ezold v. Wolf, Block, Schorr and Solis-Cohen, 983 F.2d 509, 531 (3d Cir.

1993).

The court does not ask whether the employer made the best business decision, but

rather whether the real reason for the adverse result suffered by the plaintiff is

discrimination. Keller v. Orix Credit Alliance, 130 F.3d 1101, 1109 (3d Cir. 1997). The

court is not permitted to set its own standards or consider the subjective business

decisions of the employer, unless there is evidence of discrimination. Ezold, 983 F.2d at

527. "An employment decision that would create a problem under prong one will likely

turn on whether the stated reason for [the adverse employment action] is so implausible

that a fact-finder could not believe it to [be] worthy of credence." Orenge v. Veneman,

No. 04-297, 2006 WL 2711651, at *15 (W.D. Pa. Sept. 20, 2006). In Brewer v. Quaker

State Oil Refining Corp., 72 F.3d 326 (3d Cir. 1995), the employer argued the reason for

firing the employee was because of his poor sales performance, while the evidence

showed the employee was the leading salesperson in the region. Id. at 330-32.

Here, plaintiff argues the poor performance reviews, warning letter, and probation actions were taken by Brush's subordinates (Blair, Rigdon, and Rittiger) to carry out Brush's April 7, 2004 directive to put plaintiff on probation or terminate him in light of Brush's April 5, 2004 meeting with plaintiff. Plaintiff argues he had no prior history of misconduct to justify probation. Plaintiff avers that he did not sign his performance objectives from March 2001 through March 2004. Plaintiff asserts a calendar malfunction was the reason he missed the April 12, 2004 meeting. Plaintiff argues he went to Rigdon's office for the rescheduled meeting on April 19, 2004 at 9:30 a.m., and Rigdon was not in her office. Plaintiff asserts he was not informed of the contents of statements he made concerning "personnel matters" for which he was being punished.

On April 5, 2004, Brush called Tademy and "was upset" and wanted to fire plaintiff. On August 31, 2004, after plaintiff's return from Qatar, Blair summarized her thoughts on the situation with plaintiff in an email sent to Brush, Rigdon, and Rittiger, stating:

1. We may never be in as strong a position for termination as we are right now. He was in a probationary period with well defined objectives. He failed to meet those objectives. It's documented and signed by all the parties.

2. Further attempts to 'rehabilitate' him means we create new tasks and a new role for him. It may also require further training, additional time sink for mentoring from multiple, key staffers, and inordinate amounts of supervisory time. If we fail to provide any of these to some undefined, defensible degree, it may play against us.

3. Crafting new objectives creates the opportunity for Gideon to develop concrete deliverables and to meet the performance expectations. It may be more difficult to argue once forms, data structures, and other artifacts of the development process start appearing for which he can assume credit.

4. Any improvement in performance set us up for an on-going struggle as he decides when and if he will perform, suiting his own objectives.

5. Allowing him to stay on for any length of time provides an opportunity for additional grievance material to be accumulated . . . .

(Pl.'s App., Tab 1 Ex. 1.64.)

Viewing the evidence in the light most favorable to plaintiff, a reasonable jury could find defendants' stated reason "unworthy of credence" and infer that the alleged nonretaliatory reason did not motivate defendants' actions. While defendants produced well-documented evidence concerning plaintiff's performance measures, warnings, and probationary actions, all these actions occurred close in time to plaintiff's discrimination complaint to Brush. The record contains little evidence showing plaintiff was subject to probation or reprimand prior to his protected activity in April 2004. The only incident of record occurred on April 2, 2004, when Brush became infuriated with plaintiff for discussing personnel issues outside his supervisory escalation path.[11] Brush's desire to terminate plaintiff and his subsequent threats are probative of retaliatory animus. Viewing Brush's statements in conjunction with Blair's reluctance to provide plaintiff additional opportunities for success, the warning letter, probationary action, and the removal of plaintiff from the ACIS system and his workspace, a genuine issue of material fact exists for a jury to decide whether the actions were pretextual.

---

[11] Defendants assert their actions after the complaints cannot be construed as retaliation because plaintiff was reprimanded prior to the complaints. Defendants aver plaintiff's March 2004 performance objective – that plaintiff become a team player – is evidence of reprimand. The court finds this objective was just that – an objective. The directive to become a team player was a performance goal, not a reprimand or punishment, as compared to the probation action and poor performance review. There is no other evidence plaintiff was reprimanded prior to his complaints.

51

Viewing the facts in the light most favorable to the plaintiff and drawing all reasonable inferences in his favor, there is sufficient evidence for a reasonable jury to conclude defendants retaliated against plaintiff for engaging in protected activity. Plaintiff's retaliation claims under § 1981 and the PHRA survive summary judgment.

### b. Prong two

Because plaintiff provided sufficient evidence to discredit defendants' reasons for the adverse employment action under prong one of the <u>Fuentes</u> test, the court will not address the second prong.

### *Conclusion*

Summary judgment must be granted in favor of Brush with respect to plaintiff's PHRA claims because no reasonable jury could conclude that Brush was a named respondent in plaintiff's PHRC administrative complaints, or that plaintiff could satisfy the four <u>Glus</u> factors.

Viewing the evidence in a light most favorable to plaintiff, no reasonable jury could find plaintiff's PHRA or § 1981 race-based discrimination claim implicating a failure to promote was timely filed because plaintiff did not file a charge with the PHRC with respect to this claim during the relevant 180-day period and filed the § 1981 claim more than four years after the alleged failure to promote occurred. Summary judgment must be granted in defendant's favor with respect to those claims.

Plaintiff's remaining § 1981 claims for hostile work environment and retaliation were timely filed because plaintiff's alleged constructive discharge occurred during the

applicable statute of limitations period. A reasonable jury could find the three <u>Berry</u> factors were satisfied and the continuing violation doctrine would apply.

Viewing all evidence in plaintiff's favor, no reasonable jury could find a race-based hostile work environment existed because plaintiff did not present evidence to show the alleged intentional discrimination was because of his race. Summary judgment must be granted in defendants' favor with respect to plaintiff's PHRA and § 1981 race-based hostile work environment claims.

After viewing the facts in the light most favorable to plaintiff, the court concludes with respect to plaintiff's PHRA retaliation claim against CMU and § 1981 retaliation claims against CMU and Brush that there are genuine issues of material fact with respect to those claims. Those claims will need to be resolved by a jury. The motion for summary judgment must be denied with respect to those claims. An appropriate order will be entered.

By the court:

<u>/s/ JOY FLOWERS CONTI</u>
Joy Flowers Conti
United States District Judge

Date: September 23, 2010